**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

LISA CAMPBELL,

     Plaintiff,      Civil Action No. 23-1507 (BAH)

     v.         Judge Beryl A. Howell

FUNCTIONAL PATHWAYS, LLC,

     Defendant.

**MEMORANDUM OPINION**

Plaintiff Lisa Campbell filed this action against her former employer, defendant Functional Pathways of Tennessee, LLC ("Functional Pathways"), alleging three counts of disparate treatment and two counts of failure to accommodate, under the D.C. Human Rights Act ("DCHRA"), D.C. Code § 2-1401 *et seq*. *See generally* Notice of Removal, Ex. A at 4–17 ("Compl."), ECF No. 1-2. Following four and a half months of discovery, Functional Pathways has moved for summary judgment. *See* Def.'s Mot. Summ. J. ("Def.'s Mot."), ECF No. 18; Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem."), ECF No. 18-1. For the reasons set forth below, Functional Pathways' motion is GRANTED.

## I. BACKGROUND

The factual background and procedural history of the instant matter are summarized below.

### A. Factual Background

Prior to her employment with Functional Pathways, plaintiff worked for fifteen years as a full-time Occupational Therapist ("OT") for Aegis Therapies ("Aegis"). Compl. ¶ 21; *see also* Def.'s Statement of Material Facts ("Def.'s SMF") ¶ 22, ECF No. 18-2; Def.'s Mot., Ex. F:

1

Excerpts from Pl.'s 1st Dep. ("Pl.'s 1st Dep.") at 4, ECF No. 18-9.[1]  Aegis was contracted to provide therapy and wellness services for Stoddard Baptist Global Care ("SBGC"), a long-term care and rehabilitation facility located in Washington, D.C., where plaintiff was assigned beginning on November 6, 2018.  *See* Compl. ¶¶ 22–24; Def.'s SMF ¶ 6.

### 1.   *Plaintiff Is Hired on PRN Status with Functional Pathways*

On September 20, 2019, Aegis notified its employees at SBGC that Aegis's contract with SBGC was ending and gave them the choice to apply for an open position with either Aegis or the new contractor, Functional Pathways.  Compl. ¶ 25.  On September 30, 2019, SBGC and Aegis's contract ended, and the next day, SBGC and Functional Pathways' contract began.  *Id.* ¶¶ 26–27; *see also* Def.'s SMF ¶ 7 ("Functional Pathways started providing therapy services to patients at SBGC on October 1, 2019.").  Prior to this transition, Josie White, the Regional Vice-President of Operations at Functional Pathways, told the Aegis staff at SBGC, "we want to hire all of you."  Compl. ¶ 28; *see also* Def.'s SMF ¶ 12 n.2.  Functional Pathways ultimately hired everyone who wanted to continue working at SBGC for Functional Pathways.  Compl. ¶ 31.

Before finalizing its Therapy Services Agreement with SBGC and before interviewing any members of the Aegis staff, however, Functional Pathways developed a staffing plan based on its evaluation of SBGC's patient census and anticipated therapy needs.  Def.'s SMF ¶ 9.  Based on this staffing plan, Functional Pathways concluded that only one full-time OT was needed at SBGC, though Aegis had previously employed at least two full-time OTs.  *Id.* ¶ 10.  Plaintiff, who had worked as a full-time OT for Aegis, applied for a position with Functional Pathways, after the full-time OT position had already been filled by Charletta Adams, who was the other full-time OT employed by Aegis; plaintiff was offered a PRN OT position, *i.e.*, an "on-

---

[1]    The pagination in several of Functional Pathways' exhibits is nonconsecutive; consequently, references to defense exhibits reflect the pagination generated automatically by the Court's Case Management/Electronic Case Filing ("CM/ECF") system.

call" position, with Functional Pathways.  Def.'s SMF ¶¶ 19, 23, 25; *see also* Pl.'s 1st Dep. at 10;
Compl. ¶¶ 34–35.  Plaintiff alleges that everyone else kept their previous status of PRN, part-
time, or full-time that they held when employed by Aegis.  Compl. ¶ 32.

### 2.     *Plaintiff Attempts to Obtain Full-Time Status*

Plaintiff began working as a PRN OT for Functional Pathways in October 2019.  *See*
Pl.'s 1st Dep. at 4; Def.'s SMF ¶ 29.  Without having to interview or submit a formal job
application, she was promoted to part-time status on March 23, 2020.  *See* Compl. ¶¶ 36, 38.
She notified her supervisor and HR that she wanted to be a full-time OT and was allegedly told
that "if her work hours ever meet full-time levels, she would be considered for a full-time
position." *Id.* ¶ 39.

At some point in 2022, Adams, the one full-time OT, resigned.  *See id.* ¶ 41; Def.'s SMF
¶ 39.  On June 8, 2020, Functional Pathways posted online a job opening for a full-time OT at
SBGC but never notified plaintiff directly of the open position, either before or after posting the
job vacancy online.  Compl. ¶¶ 45–47.  Plaintiff met with her supervisor, Sadashiv Aggarwal, on
June 18, 2020, to discuss the job opening, at which meeting Aggarwal criticized plaintiff's
productivity, allegedly for the first time.  *Id.* ¶¶ 49–51.[2]  Plaintiff then informed HR that she
wanted to be considered for the full-time position and was told to submit her resume formally
and interview for the position.  *Id.* ¶¶ 52–53.

Plaintiff interviewed for the full-time position on July 1, 2020, with Aggarwal and Vikas
Prasad, the Area Director of Operations.  Def.'s SMF ¶¶ 11 n.1, 41.  According to plaintiff,
during the interview, she was asked managerial questions "unrelated to the job duties of a full-

---

[2]     Specifically, "[t]he productivity expectation" for plaintiff was that she "had to spend 90 percent of [her]
work time with a patient," and "10 percent of [her] work time . . . performing paperwork." Pl.'s 1st Dep. at 5.
Plaintiff contends that this "90 percent productivity goal" was "unrealistic" and concedes that she met this goal only
"[o]ccasionally" and "not very often." *Id.*

time OT," Compl. ¶ 55, but, when pressed, did not "recall specifically" "any of the managerial questions [she was] asked," Pl.'s 1st Dep. at 12.  She concedes that "the interview did not go well," and that "[i]t was not a good performance."  Pl.'s 1st Dep. at 12.  She "stuttered," "had no control of . . . [her] words," and "was very embarrassed because [she] never felt so out of control before."  *Id.* at 13.  She describes her "thoughts" as "scrambled in [her] head" and "the entire interview" as "the worst experience of [her] life" and "horrible" because "it did not reflect who [she] really [is] as a therapist."  *Id.*  Although she claims to have "experienced an anxiety attack," she did not disclose her anxiety attack to Aggarwal, Prasad, HR, or "any other corporate officials."  *Id.* at 12–13.  She further concedes that she "didn't do anything to prepare for the interview."  *Id.* at 15.

Despite plaintiff's poor performance, Aggarwal wanted to provide plaintiff another chance to interview.  Def.'s SMF ¶ 44; *see also* Def.'s Mot., Ex. A: Decl. of Sadashiv Aggarwal, ECF No. 18-4.  Her second interview was never conducted because "it was scheduled on a day that [plaintiff] wasn't supposed to report to work; and when [she] did report to work, it was never mentioned" by either Aggarwal or plaintiff.  Pl.'s 1st Dep. at 16.  Soon thereafter, plaintiff "went on [a] leave of absence."  *Id.*

The full-time OT position was not filled until January 2021, when plaintiff was no longer employed by Functional Pathways.  *See* Def.'s Mem. at 4.

### 3.    *Plaintiff Requests a Special Computer*

When plaintiff was first interviewed for a job with Functional Pathways on September 24, 2019, she allegedly told April Stouffer, her interviewer, about her disability in response to a question about a nine-month gap in her work experience—specifically, "that she had undergone a bilateral mastectomy due to breast cancer and that her eye had been surgically removed," and

that she would thus "require, as an accommodation, a computer with enlarged font."  Compl. ¶¶ 29–30; *see also* Pl.'s 1st Dep. at 6, 11; Def.'s SMF ¶¶ 23–25.  Though alleging that Stouffer promised to "take care of it," plaintiff concedes that she never "fill[ed] out any paperwork related to an accommodation request" or "have a follow-up conversation with Ms. Stouffer about [her] need for accommodation."  Pl.'s 1st Dep. at 6–7.  Indeed, in her onboarding forms, plaintiff did not raise any issues with her vision, much less the need for a visual accommodation, even in response to a question in the Physical Examination form, specifically asking about her vision. Def.'s SMF ¶ 28.  In addition, in a HR form, she "declined to answer" a question regarding her disability status.  *Id.* ¶ 27; *see* Def.'s Mot., Ex. D: Decl. of Christine West ("West Decl."), Ex. 6, ECF No. 18-7.

In October 2019, plaintiff met with Aggarwal and Prasad about her disability, at which meeting Prasad told her they would "take care of it."  Pl.'s 1st Dep. at 6.  Plaintiff, however, allegedly did not receive any communication about her accommodation request until May 11, 2020, when Aggarwal informed her that a special computer was available for her once she provided a reasonable accommodations form signed by her doctor.  Compl. ¶¶ 65, 67; *see also* Pl.'s 1st Dep. at 8–9.  Plaintiff told Aggarwal that due to the COVID-19 pandemic, she was unable to obtain a signed doctor's note.  Pl.'s 1st Dep. at 7–9; *see also* Compl. ¶ 68.  She concedes, however, that she attempted only once to contact her doctor but was sent to voicemail, never tried to email or text her doctor, and never submitted the requested doctor's note to Functional Pathways.  Pl.'s 1st Dep. at 8.

Plaintiff did not speak with HR about her need for an accommodation until June 22, 2020, when she emailed McCoy to inform her that Aggarwal and Prasad had agreed to grant her a special laptop once "a reasonable accommodation form" had been "signed by [her] physician."

Def.'s Mot., Ex. B: Decl. of Jacklyn McCoy ("McCoy Decl."), Ex. 1, ECF No. 18-5.[3]  She

explained that "due to the pandemic," obtaining a signed doctor's note "ha[d] not been possible"

and asked for "an exception [to] be made" to "allow[] use of the computer, effective now," in

light of the fact that "[t]he past eight months"—from October 2019 to June 2020—"have become

progressively challenging."  *Id.*; *see also* Pl.'s 1st Dep. at 7.  HR promptly granted the exception

the next day, and plaintiff received a special computer on June 30, 2020.  Def.'s SMF ¶ 35.

Plaintiff contends, however, the computer she received was inadequate because its "keyboard

lacked contrast, which made it visually taxing, and the font size was not large enough to meet

[plaintiff's] needs."  Compl. ¶ 73; *see also* Pl.'s 1st Dep. at 7–8.  Plaintiff followed up with

Aggarwal to let him know that "the computer didn't provide the type of accommodations that

[she] felt like [she] needed," but never followed up with McCoy, claiming that she "didn't feel

that it was necessary."  Pl.'s 1st Dep. at 8.

### 4.    *Plaintiff Requests Extended Leave During the COVID-19 Pandemic*

Due to plaintiff's various medical conditions, she alleges that she was "at higher risk of

developing serious COVID symptoms than the general population."  Compl. ¶ 75.  Accordingly,

she requested and was granted three periods of leave, totaling from August 3 to November 5,

2020.  *Id.* ¶ 88.[4]  Plaintiff contends that, in connection with her requests for leave, she submitted

three signed doctor's notes: stating (1) on June 27, 2020, that she could not work between

August 3 and September 3, 2020; (2) on September 1, 2020, that she could not work between

---

[3]    Plaintiff's email states that she "notified HR of [her] visual impairments" "last October," McCoy Decl., Ex. 1; *see also* Compl. ¶ 63, but she testified, during her deposition, she spoke to only Aggarwal and Prasad, not to HR, in October 2019, and did not "recall" "hav[ing] a conversation or an email exchange or text exchange with anyone in human resources between September 24th, 2019, and June 22nd, 2020," when she emailed Jackie McCoy, Pl.'s 1st Dep. at 6–7.

[4]    Plaintiff also requested FMLA leave on June 27, 2020, which request was denied on July 31, 2020, on the basis that she failed to meet the 12-month length of service requirement or the hours worked requirement.  Compl. ¶¶ 77–78; *see also* Pl.'s 1st Dep. at 29 (acknowledging that she was "told that [she] did not qualify for FMLA leave").  The denial of plaintiff's request for FMLA leave is not at issue here.

September 4 and October 2, 2020; (3) on October 5, 2020, that she could not work between October 5 and November 5, 2020. *Id.* ¶¶ 76, 85–86. She concedes, however, that although she purports to have requested leave based on her "high risk from [COVID-19] due to [her] pre-existing medical[] conditions," none of her doctor's notes expressly mentioned COVID-19 or plaintiff's heightened risk of contracting COVID. *See* Pl.'s 1st Dep. at 30; *see, e.g.*, Pl.'s 1st Dep., Ex. 23 (July 27, 2020 doctor's note stating, "[d]ue to a chronic medical disorder, she is unable to work from Monday, 8/3/2020 through 9/3/2020"); Pl.'s 1st Dep., Ex. 33 (September 1, 2020 doctor's note stating, "Lisa Campbell is currently under my care and will need to remain out of work due to an acute medical condition from 9/4/2020 through 10/2/2020"); Pl.'s 1st Dep., Ex. 34 (October 5, 2020 doctor's note stating, "Lisa Campbell remains under my care and will need to remain off from work from 10/5/2020 through 11/5/2020. Although her symptoms are improving, a firm return-to-work date is not available at this time.").

On October 16, 2020, Christine West, director of Human Resources, sent plaintiff an email, stating:

> [W]hile we would be happy to consider another Leave extension for you beyond your current anticipated Return to Work Date of 11/6/20 if you qualify for such extension, we would need a more specific Medical Certification in order to consider any additional time off beyond the 11/6/20 date. If you are not able to return to work on or before 11/6/20, your next doctor's certification must include: [1] the specific nature of your impairment/need for additional leave[;] [2] the expected duration of any such requested leave and anticipated return date[;] [3] if you are medically able to return, but with restrictions, please have your [doctor] specify those restrictions.

West Decl., Ex. 10. West also gave plaintiff the option of transitioning from part-time to PRN status, which would give her "the right to accept or decline any assignments offered" and "allow for a little more flexibility" without "hav[ing] to continue seeking leave approvals for [her] absences." *Id.* Plaintiff concedes that, although she read West's email, she did not provide any

of the requested information, that it was "[s]olely [her] decision" to choose not to provide the information, and that she, in fact, never responded to West's email.  Pl.'s 1st Dep. at 30.

On November 3, 2020, West emailed plaintiff again about the requested medical information and offered "to set up a call with [plaintiff's] medical practitioner," "if that would be more convenient."  West Decl., Ex. 10.  West acknowledged that she had received a doctor's note, dated November 3, 2020, which read: "Lisa Campbell continues to be under my care for the treatment of multiple medical disorders.  She will need to continue to remain out of work from 11/5/2020 through 12/5/2020.  It is medically necessary for her to remain out of work and although her symptoms are improving, she is unable to return at this time."  Pl.'s 1st Dep., Ex. 35; *see also* West Decl., Ex. 10.  West told plaintiff, however, that this letter did not include the "more specific medical certification details" required "in order to consider any further extensions to [plaintiff's] Leave of Absence."  West Decl., Ex. 10.  Plaintiff replied: "I sent you the letter from my healthcare provider and I do not wish to provide any additional information regarding my personal medical condition."  West Decl., Ex. 11; *see also* Pl.'s 1st Dep. at 32 (admitting that this email exchange occurred).

Three days later, West emailed plaintiff again, informing her that Functional Pathways "will consider another leave extension" as long as plaintiff provides "a more specific doctor's certification," as "noted in [West's] October 16, 2020 email."  West Decl., Ex. 11.  "This information," West explained, "is critical to determining whether [plaintiff] qualif[ies] for leave based on [her] impairment, what limitations or restrictions [she has], and what reasonable accommodation may be appropriate."  *Id.*  West reminded plaintiff that her November 3, 2020 doctor's note, which stated only that plaintiff is "'under care' for 'treatment of multiple medical disorders' and that [her] 'symptoms are improving,'" "falls short of the medical information the

Company is entitled to receive in order to determine whether [she] qualif[ies] for extended leave." *Id.* She then reiterated her "request[] that [plaintiff] provide a more specific medical certification listing all the information [she] requested in [her] e-mail of October 16, 2020, by November 20, 2020. . . . Otherwise, any absences beginning on November 6, 2020 will be considered unexcused and will subject [her] to discipline, up to and including termination." *Id.* Plaintiff did not respond to this email and never provided the requested information or authorization for West to speak directly with plaintiff's medical provider. *See* Pl.'s 1st Dep. at 21 (admitting that "termination was mentioned as a possibility of occurring if [she] did not provide the information that they requested in order to extend [her] leave of absence," conceding that she "did not provide the information" and "made the decision not to do that," and acknowledging that she "understood when [she] made the decision not to provide the requested information that that was a condition for them considering [her] leave of absence request for November 6th forward"); *id.* at 33 (admitting that she received West's November 10 email and never offered to set up a call between West and her doctor.[5]

Accordingly, on December 1, 2020, West emailed plaintiff, stating:

We have requested on multiple occasions the information necessary for us to review any further extensions of your Leave of Absence beyond November 10, 2020. We were willing to consider an additional extension[] and asked you to provide what we needed in order to consider this. Not only did you not submit the information requested, but you also failed to make any contact at all with anyone in response to that request by the deadline of November 10, 2020. As a

---

[5]     Plaintiff, in addition, admits that she never submitted a Return to Work Release, *i.e.*, a "form issued by [her] healthcare provider indicating clearance to return to [her] normal job duties . . . without restrictions," which form was required per Functional Pathways policy. Pl.'s 1st Dep. at 31; *see also* Pl.'s 1st Dep., Ex. 24 (email from West to plaintiff granting her leave from August 3 to September 3, 2020, and informing her that, "prior to returning to work, [she] will need a release from [her] doctor stating [she is] clear to return to [her] normal job duties without restriction"). Such form would have been particularly crucial in plaintiff's case, given her doctor's prognosis, in plaintiff's October 5, 2020 Disability Claim Form, that plaintiff was "unable to complete tasks, interact w[ith] others, work in group settings, unable to care for [patients]." Pl.'s 1st Dep., Ex. 29; *see also* Pl.'s 1st Dep. at 32 (conceding that she was never "cleared to provide care for patients," and that "caring for patients is an indispensable part of an occupational therapist's job").

result, we consider you to have voluntarily resigned your position effective November 10, 2020.

Pl.'s 1st Dep., Ex. 32.

### B.    Procedural History

Plaintiff filed, on August 20, 2020, an Intake Questionnaire with the D.C. Office of Human Rights ("DCOHR"), alleging discrimination based on race and disability, as well as retaliation. *See* Def.'s Mot., Ex. G: Excerpts from Pl.'s 2d Dep. ("Pl.'s 2d Dep."), Ex. 38, ECF No. 18-10.  Plaintiff then commenced this action, on April 18, 2023, in D.C. Superior Court, which action was removed by Functional Pathways to this Court, on May 25, 2023.

The complaint alleges five counts of disability discrimination under the DCHRA: three disparate treatment claims based on plaintiff being hired by Functional Pathways as an employee on PRN, rather than full-time, status, Compl. ¶¶ 92–97 (Count 1); her failure to be promoted to full-time status, *id.* ¶¶ 98–104 (Count 2); and her termination, *id.* ¶¶ 117–19 (Count 5); as well as two failure to accommodate claims based on Functional Pathways' failure to provide, in a timely fashion, a special computer to accommodate plaintiff's visual disability, *id.* ¶¶ 105–09 (Count 3); and failure to extend plaintiff's leave of absence during the COVID-19 pandemic, despite her heightened risk of developing serious COVID symptoms, *id.* ¶¶ 110–16 (Count 4).  Plaintiff seeks back pay, compensatory damages, attorneys' fees and costs, and any "further relief as the court may deem just and proper."  *Id.* (Prayer for Relief).

Functional Pathways, in turn, has moved for summary judgment on all five claims. Pursuant to the Court's July 6, 2023 Scheduling Order, which adopted in full the briefing schedule posed by the parties in their Joint Meet and Confer Statement, *see* J. Meet & Confer Statement, ECF No. 10, plaintiff's opposition to Functional Pathways' motion was due on January 22, 2024.  *See* Min. Order (July 6, 2023).  With Functional Pathways' consent, plaintiff

sought and was granted three extensions of time, until February 12, 2024, to file her opposition. *See* Pl.'s Mot. for Extension of Time, ECF No. 19; Min. Order (Jan. 2, 2024) (granting motion and directing plaintiff to file her opposition by February 5, 2024); Pl.'s Mot. for Extension of Time, ECF No. 20; Min. Order (Feb. 5, 2024) (granting motion and directing plaintiff to file her opposition by February 9, 2024); Pl.'s Mot. for Extension of Time, ECF No. 21; Min. Order (Feb. 12, 2024) (granting motion and directing plaintiff to file her opposition by February 12, 2024).

On February 26, 2024, when plaintiff still had not filed her opposition, an order was entered, directing plaintiff to show cause, by March 1, 2024, why the arguments in Functional Pathways' motion for summary judgment should not be deemed conceded by plaintiff.  Min. Order (Feb. 26, 2024).  On March 1, 2024, plaintiff's counsel notified the Court that plaintiff had a medical emergency on or around February 15, 2024, that counsel had not heard from plaintiff since, and that plaintiff's opposition had been prepared and counsel was just waiting for plaintiff's sign-off.  Pl.'s Resp. to Order to Show Cause, ECF No. 22.  Without filing an accompanying motion, plaintiff "request[ed] to have until March 11, 2024," to file her opposition.  *Id.*

On March 15, 2024, when plaintiff still had not yet filed her opposition, plaintiff's counsel notified the Court that he finally heard from plaintiff that afternoon.  Pl.'s Suppl. Resp. to Order to Show Cause, ECF No. 23.  Again, without filing an accompanying motion, plaintiff "request[ed] until . . . March 18, 2024 to file" her opposition, and counsel represented that "[t]he undersign will file same [sic] even if no further communications are made by Plaintiff so that this matter can move forward."  *Id.*

11

Plaintiff failed to file her opposition on March 18, 2024.  Over two weeks later, on April 2, 2024, plaintiff moved for a fourth extension of time, until April 5, 2024, to file her opposition. *See* Pl.'s Mot. for Extension of Time, ECF No. 24.  Over Functional Pathways' objection, plaintiff's motion was granted in part, and plaintiff was directed to file, by April 4, 2024, her opposition in light of plaintiff's counsel's representation that the opposition had been drafted since at least February 15, 2024, and would be filed by March 18, 2024, "even if no further communications are made by Plaintiff."  *See* Min. Order (Apr. 3, 2024) (emphasizing that plaintiff's motion offered no "reason why her opposition, which has been drafted since at least February 15, 2024, cannot be filed now").

As of the filing of this Memorandum Opinion, almost one month after the April 4, 2024 deadline and over three months after the original January 22, 2024 deadline, plaintiff still has not filed her opposition to Functional Pathways' motion for summary judgment.

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine issue of material fact exists 'if the evidence, viewed in a light most favorable to the nonmoving party, could support a reasonable jury's verdict for the nonmoving party.'"  *Figueroa v. Pompeo*, 923 F.3d 1078, 1085 (D.C. Cir. 2019) (quoting *Hairston v. Vance-Cooks*, 773 F.3d 226, 271 (D.C. Cir. 2014)).  The moving party bears the burden to demonstrate the "absence of a genuine issue of material fact" in dispute, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), while the nonmoving party must present specific facts supported by materials in the record that would be admissible at trial, and that could enable a reasonable jury to find in its favor, *see Allen v. Johnson*, 795 F.3d 34, 38

(D.C. Cir. 2015) (nothing that, on summary judgment, the appropriate inquiry is "whether, on the evidence so reviewed, 'a reasonable jury could return a verdict for the nonmoving party'" (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007) ("[S]heer hearsay . . . counts for nothing on summary judgment." (citation omitted)); Fed. R. Civ. P. 56(c), (e)(2)–(3).  The Court is required to consider only the materials explicitly cited by the parties but may, on its own accord, consider "other materials in the record."  Fed. R. Civ. P. 56(c)(3).

"Evaluating whether evidence offered at summary judgment is sufficient to send a case to the jury is as much art as science."  *Est. of Parsons v. Palestinian Auth.*, 651 F.3d 118, 123 (D.C. Cir. 2011).  This evaluation is guided by the related general principles that "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment," *Tolan v. Cotton*, 572 U.S. 650, 656 (2014), and "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor," *id.* at 651 (alteration in original accepted and citation omitted).  Courts "may not make credibility determinations or weigh the evidence," *Iyoha v. Architect of the Capitol*, 927 F.3d 561, 565 (D.C. Cir. 2019) (internal quotation marks and citations omitted), since "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) (internal quotation marks and citation omitted), but [t]he fact that a plaintiff's testimony is uncorroborated is immaterial for purposes of summary judgment, since "[c]orroboration goes to credibility, a question for the jury, not the district court," *Robinson v. Pezzat*, 818 F.3d 1, 9 (D.C. Cir. 2016).

Nonetheless, for a factual dispute to be "genuine," the nonmoving party must establish more than "[t]he mere existence of a scintilla of evidence in support of [its] position," *Liberty*

*Lobby*, 477 U.S. at 252, and cannot rely on "mere allegations" or conclusory statements, *see Equal Rts. Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1141 n.3 (D.C. Cir. 2011) (internal quotation marks omitted); *accord* Fed. R. Civ. P. 56(e).  If "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Lash v. Lemke*, 786 F.3d 1, 6 (D.C. Cir. 2015) (internal quotation marks omitted) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

The movant's burden under Rule 56 "does not shift simply because the non-moving party fails to oppose the motion." *Cohen v. Bd. of Trs. of Univ. of D.C.*, 819 F.3d 476, 482 (D.C. Cir. 2016).  Rather, "[t]he burden is always on the movant to demonstrate why summary judgment is warranted." *Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 505 (D.C. Cir. 2016) (citation omitted).  "Rule 56(e) specifically empowers a court to give a party who has failed to address a summary judgment movant's assertions of fact 'an opportunity to properly support or address' the fact." *Grimes v. District of Columbia*, 794 F.3d 83, 92 (D.C. Cir. 2015) (quoting Fed. R. Civ. P. 56(e)(1)).  Consequently, "[u]nder the Federal Rules of Civil Procedure, a motion for summary judgment cannot be 'conceded' for want of opposition." *McLean*, 843 F.3d at 505.

"At the same time, Rule 56(e) authorizes a less forgiving approach in appropriate circumstances" and "allows a court to consider a fact undisputed if it has not been properly supported or addressed as required by Rule 56(c)." *Grimes*, 794 F.3d at 92 (alteration in original accepted and citation omitted).  "Indeed, for the evidentiary burden that Rule 56(c) places on nonmovant plaintiffs to function, a court must be able to evaluate an inadequately supported assertion of material fact and deem it not materially disputed, such that summary judgment is warranted in whole or in part." *Id.*  Put differently, although a motion for summary judgment

14

cannot be granted as conceded for lack of an opposition, it may be granted "if, after fully

considering the merits of the motion, [a court] finds that [summary judgment] is warranted."

*McLean*, 843 F.3d at 507–08.

## III.   DISCUSSION

Plaintiff alleges five counts of disability discrimination under the DCHRA: three

disparate treatment claims based on plaintiff being hired by Functional Pathways as an employee

on PRN, rather than full-time, status (Count 1); her failure to be promoted to full-time status

(Count 2); and her termination (Count 5), as well as two failure to accommodate claims based on

Functional Pathways' failure to provide, in a timely fashion, an special computer to

accommodate plaintiff's visual disability (Count 3); and failure to extend plaintiff's leave of

absence during the COVID-19 pandemic , despite her heightened risk of developing serious

COVID symptoms (Count 4).

The DCHRA prohibits an employer from discriminating against an employee "wholly or

partially for a discriminatory reason based upon . . . disability."  D.C. Code § 2-1402.11(a).

"When evaluating claims brought under the DCHRA, 'decisions construing the [Americans with

Disability Act ("ADA")] are considered persuasive.'"  *Giles v. Transit Emps. Fed. Credit Union*,

794 F.3d 1, 5 (D.C. Cir. 2015) (quoting *Grant v. May Dep't Stores Co.*, 786 A.2d 580, 583–84

(D.C. 2001)); *see also Seth v. District of Columbia*, 813 F. App'x 611, 613 n.1 (D.C. Cir. 2020)

("The DCHRA is . . . interpreted in parallel with the ADA."); *Hunt v. District of Columbia*, 66

A.3d 987, 990 (D.C. 2013) ("Our decisions under the DCHRA . . . effectively incorporate

judicial construction of related anti-discrimination provisions of the [ADA].").  "To demonstrate

discrimination in violation of . . . the DCHRA, the plaintiff 'must prove that he had a disability

within the meaning of the [DCHRA], that he was 'qualified' for the position with or without a

reasonable accommodation, and that he suffered an adverse employment action because of his disability." *Giles*, 794 F.3d at 5 (citation omitted).

Functional Pathways seeks summary judgment on all five counts.  As to the disparate treatment claims, which trigger the familiar *McDonnell-Douglas* burden-shifting framework, Functional Pathways offers legitimate, nondiscriminatory reasons for each of the three employment actions that underlie the claims and contends that plaintiff cannot meet her subsequent burden of proving that these reasons are pretext for discrimination.  *See* Def.'s Mem. at 8–15, 20–27.  As to the failure to accommodate claims, Functional Pathways contends that plaintiff was provided a reasonable accommodation for her visual disability, and that plaintiff never sought COVID leave.  *Id.* at 15–20.  These arguments are addressed *seriatim*.[6]

## A.    Disparate Treatment Claims (Counts 1, 2, and 5)

DCHRA disparate treatment claims, like those brought under the ADA, trigger the familiar *McDonnell-Douglas* burden-shifting framework.  *See Raytheon Co. v. Hernandez*, 540 U.S. 44, 49 n.3 (2003); *Young v. United Parcel Servs., Inc.*, 575 U.S. 206, 212–13 (2015).  Under this framework, "a plaintiff must first establish a prima facie case of discrimination."  *Raytheon*, 540 U.S. at 49 n.3 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).  "The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its employment action."  *Id.*  This "burden is one of production, not persuasion" and "can involve

---

[6]    Functional Pathways also argues that plaintiff's complaint should be dismissed as defective, for having named "Functional Pathways, LLC," rather than "Functional Pathways of Tennessee, LLC," as defendant, and for failing to cure this defect even after Functional Pathways' removal paperwork and answer.  Def.'s Mot. at 7.  The only case cited in support of this argument is *Bjorgung v. Whitetail Resort, LP*, 550 F.3d 263 (3d Cir. 2008), in which plaintiff sued previous, rather than current, owners of the ski resort where he was injured.  Summary judgment was granted in favor of defendants based, in part, on defendants' "denial of ownership," *id.* at 265, and plaintiff sought leave to amend his complaint, under Federal Rule of Civil Procedure 15, to name the proper defendants—the current owners—which motion was denied by the district court and affirmed by the Third Circuit, *id.* at 266.  The instant matter is plainly distinguishable and is more akin to a misspelling.  *Cf. Grannis v. Ordean*, 234 U.S. 385, 395 (1914) (explaining, albeit in a different context, that a defendant "cannot safely ignore [service] on account of [a] misnomer").  Functional Pathways does not argue that the omission of "of Tennessee" contributed to any confusion or resulted in inadequate notice, and, accordingly, this argument that plaintiff's claims should be dismissed for naming the wrong defendant is rejected.

no credibility assessment." *Reeves*, 530 U.S. at 142 (citation omitted).  Due to this slight burden, the initial "prima facie case is a largely unnecessary sideshow," especially at the summary judgment stage, becoming "irrelevant" once "an employer has asserted a legitimate, non-discriminatory reason for its decision—as an employer almost always will do by the summary judgment stage of an employment discrimination suit." *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008).

If the employer satisfies its burden of production, "the *McDonnell Douglas* framework—with its presumptions and burdens—disappear[s], and the sole remaining issue [is] discrimination *vel non*." *Reeves*, 530 U.S. at 142–43 (citations omitted).  The question becomes whether plaintiff has met her burden of "prov[ing] by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.* at 143 (citation omitted); *see also Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009) ("[T]he only question is whether the employee's evidence creates a material dispute on the ultimate issue of retaliation either directly by showing that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." (citation omitted)).  "Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves*, 530 U.S. at 143 (alteration in original accepted and citation omitted).

### 1.    *Failure to Hire at Full-Time Status (Count 1)*

Functional Pathways does not argue that plaintiff failed to establish a prima facie case of disparate treatment or that plaintiff's hiring at PRN, rather than full-time, status does not constitute an adverse action.  Rather, Functional Pathways asserts a legitimate,

nondiscriminatory reason for hiring plaintiff as a PRN employee: After evaluating SBGC's patient census and therapy needs, which evaluation was completed prior to Functional Pathways submitting a contract proposal to SBGC and prior to plaintiff applying for a position at Functional Pathways, Functional Pathways concluded that only one full-time OT was necessary and hired Adams on September 6, 2019, eighteen days before plaintiff even interviewed for a position with Functional Pathways. *See* Def.'s Mem. at 2, 22–23.

Plaintiff, in turn, has not produced sufficient evidence for a reasonable jury to find that Functional Pathways' asserted nondiscriminatory reason was not the actual reason for terminating plaintiff's employment. *See Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). The only evidence of disability discrimination proffered by plaintiff is (1) White's comment, during a meeting with Aegis staff, that "we want to hire all of you"; (2) the fact that plaintiff mentioned her disability and need for an accommodation during her interview for a job with Functional Pathways; and (3) the fact that "[a]ll previous Aegis staff who were hired by [Functional Pathways] kept the status—PRN, part-time, or full-time—that they had while working for Aegis, except for [plaintiff]." Compl. ¶¶ 28, 30, 32, 94–95.

None of these pieces of evidence, separately or together, is sufficient to suggest—much less prove—pretext. First, White's comments merely reflected Functional Pathways' desire "to hire all" former Aegis employees who sought employment at Functional Pathways, which plaintiff concedes it did, *see id.* ¶ 31, and made no promises about hiring them at the status they had at Aegis. Second, Functional Pathways' knowledge of plaintiff's disability in insufficient to sustain a plaintiff's burden on summary judgment. *See Tyes-Williams v. Garland*, No. 17-cv-1191, 2021 WL 4262631, at *4 (D.D.C. Sept. 20, 2021) ("[A] decisionmaker's knowledge of an applicant's race does not suggest—let alone prove—that he discriminated against the

applicant."); *see also Christopher v. Adam's Mark Hotels*, 137 F.3d 1069, 1073 (8th Cir. 1998) ("Mere knowledge of a disability cannot be sufficient to show pretext; otherwise, summary judgment for an employer would be appropriate only in cases where the employer is completely unaware of the plaintiff's disability."); *Brown v. Kelsey-Hayes Co.*, 814 F. App'x 72, 84 (6th Cir. 2020) (similar); *Klimek v. United Steel Workers Loc. 397*, 618 F. App'x 77, 80 (3d Cir. 2015) (similar).  Third, the fact that all previous Aegis staff, except plaintiff, kept the same status does not suggest pretext and is entirely consistent with the proffered nondiscriminatory reason that Functional Pathways, after evaluating the needs at SBGC, decided that only one full-time OT was necessary and had already filled the position by the time plaintiff applied.  As Functional Pathways explains, "that Functional Pathways' staffing plan was different than Aegis' plan is not discriminatory."  Def.'s Mem. at 22.  "To conclude otherwise . . . , would be to render the judiciary a super-personnel department that reexamines an entity's business decisions—a role [courts] have repeatedly disclaimed."  *Adeyemi*, 525 F.3d at 1227 (citation omitted).[7]

Whereas "defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff," *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254 (1981), plaintiff has made no attempt and thus fails to satisfy her subsequent burden of demonstrating that defendants' proffered reason is pretext for discrimination.  Accordingly, Functional Pathways' motion for summary judgment on Count 1 is granted.

## 2.   *Failure to Promote to Full-Time Status (Count 2)*

At the outset, whether plaintiff brings a claim for failure to promote or failure to hire is unclear, in light of the fact that plaintiff, who had expected to be promoted to full-time status, was asked to apply formally and interview for the open full-time OT position—and plaintiff filed

---

[7]     Functional Pathways reads plaintiff's complaint to suggest that she believes "she should have been offered the full-time Occupational Therapist position instead of Ms. Adams."  Def.'s Mem. at 22.  This allegation is nowhere in the complaint, *see* Compl. ¶¶ 28–35, 92–97, and Functional Pathways offers no citations to the contrary.

no opposition brief that might have clarified her claim.  In any event, the Court assumes, without deciding, that plaintiff has suffered an adverse action.  To be sure, "[f]ailure to promote is generally an adverse action," as long as "there is [an] open position," which there was in the instant case.  *Yarber-Buteler v. Billington*, 53 F. App'x 120, 120 (D.C. Cir. 2002).  Here, however, Functional Pathways contends that plaintiff was still in the running for the open full-time OT position, alleging that "Aggarwal provided [plaintiff] with materials that he believed would help her interview better and advised her that she would get a second chance."  Def.'s Mem. at 26.  Yet, plaintiff "did not attend the second interview because it was scheduled on a day that she did not work, and a new date was not set before her leave of absence started on August 3, 2020."  *Id.*; *see also* Pl.'s 1st Dep., Ex. 7 (admitting that Aggarwal wanted to meet with plaintiff and Prasad again "to reassess [plaintiff's] knowledge of topics discussed during the July 1, 2020 interview," that "[t]his meeting would determine [her] eligibility for the full-time Occupational Therapy position," that the meeting was scheduled on a day plaintiff was not in the office, due to "an oversight by both" parties, and that "neither Mr. Aggarwal nor [plaintiff] mentioned the meeting and [so] it never occurred").  Indeed, the full-time OT position was not filled until January 2021, after plaintiff left Functional Pathways.  Def.'s Mem. at 26.

The question whether the circumstances in this case constitute a failure to promote need not be decided because, even if plaintiff suffered an adverse action and made out a prima facie case of discrimination, Functional Pathways asserts a legitimate, nondiscriminatory reason for failing to promote plaintiff to full-time status: plaintiff's "poor interview performance."  *Id.* at 24.  Plaintiff does not dispute that her interview performance was inadequate.  In fact, she concedes that "the interview did not go well," her "thoughts" were "scrambled in [her] head," and that she "stuttered" and "had no control of . . . [her] words."  Pl.'s 1st Dep. at 12–13.  She

admits that she "didn't do anything to prepare for the interview" and describes "the entire interview," including her performance, as "the worst experience of [her] life" and "horrible" because "it did not reflect who [she] really [is] as a therapist." *Id.* at 13, 15; *see also* Pl.'s 1st Dep., Ex. 7 ("agree[ing]" with the statement that plaintiff "provided subpar responses to questions relating to compliance issues and how she would handle certain clinical situations," and admitting that the "interview did not go well").

Plaintiff nonetheless argues that Functional Pathways' failure to promote her was discriminatory. Again, she emphasizes that Functional Pathways knew about her disability, Compl. ¶ 99, but, as explained above, mere knowledge is insufficient to sustain plaintiff's burden. She then takes issue with the hiring process in two respects. First, she contends that she should not have been required to interview for the full-time position because she met "the job qualifications for a full-time OT," *id.* ¶ 101, and three Speech Therapists at SBGC, who plaintiff contends are "similarly situated" were promoted from PRN to full-time status without being required to interview or submit a resume, *id.* ¶¶ 59, 103. Even setting aside the question whether three Speech Therapists are "similarly situated" to plaintiff, an Occupational Therapist, given that Functional Pathways could have reasonably needed more Speech Therapists than Occupational Therapists, plaintiff's evidence is insufficient to demonstrate pretext. Indeed, Functional Pathways offers a legitimate, nondiscriminatory reason for requiring plaintiff to interview, rather than directly promoting her: plaintiff's productivity was cause for concern. Def.'s Mem. at 24. Again, plaintiff does not dispute that she had been criticized for her productivity before she applied for the full-time OT position. Compl. ¶¶ 49–50. She also does not dispute that she repeatedly failed to meet Functional Pathways' productivity requirement, acknowledging that her "productivity expectation" was "to spend 90 percent of [her] work time

with a patient" and "10 percent of [her] work time . . . performing paperwork," and conceding

that she met this goal only "[o]ccasionally" and "not very often."  Pl.'s 1st Dep. at 5.  Whether or

not this productivity expectation is "unrealistic," *id.*, Functional Pathways' expectation that she

meet this "expectation," without more, is not evidence of disability discrimination.

Second, plaintiff argues that, during the interview, she was asked "managerial questions

that were unrelated to the job duties of a full-time OT," specifically questions about a Centers for

Medicare and Medicaid Services policy called Patient Driven Payment Model ("PDPM"),

Compl. ¶ 55, though when pressed at her deposition, plaintiff did not "recall specifically" "any of

the managerial questions [she was] asked during the interview," Pl.'s 1st Dep. at 12.  In

response, Functional Pathways offers a legitimate, nondiscriminatory reason for asking these

questions: Questions about "the then recently implemented PDPM regulations and clinical

situations were related" to the full-time OT position and "to the ongoing success of Functional

Pathways" because the PDPM affects "both Functional Pathways' treatment of patients and

reimbursement from the Center for Medicare and Medicaid Services."  Def.'s Mem. at 24–25.

Plaintiff, in her deposition, concedes that questions about the PDPM are, in "[s]ome aspects,"

"relevant to the full-time OT position."  Pl.'s 1st Dep. at 12.  In any case, she has offered no

reason why these questions, regardless of whether they were relevant to the full-time OT

position, could possibly be construed as pretext for disability discrimination.[8]

In sum, plaintiff has not produced a modicum of evidence, much less sufficient evidence,

for a reasonable jury to find that Functional Pathways' stated reason—her poor interview

---

[8]   Functional Pathways reads the complaint to suggest that plaintiff's "experience and credentials demonstrate
that she is significantly better qualified for the job than Ms. Delgado," who was ultimately hired for the full-time OT
position.  Def.'s Mem. at 26 (emphasis and citation omitted).  The complaint, however, makes no mention of
Delgado, much less in the context of her failure to promote claim.  *See* Compl. ¶¶ 36–60, 98–104.  In fact, plaintiff
testified, in her deposition, that she did not "know anything about [Delgado] other than her name."  Pl.'s 1st Dep. at
23; *see also* Pl.'s 1st Dep., Ex. 7 ("Ms. Delgado's interview performance has no bearing on my discrimination
charge against [Function Pathways].  All matters relevant to this case occurred prior to Ms. Delgado's interview and
alleged January 2021 date of hire.  To imply that Ms. Delgado is more qualified is . . . irrelevant.").

performance—was not the actual reason for refusing to promote plaintiff to full-time status or to hire plaintiff for the open full-time OT position.  A court "may not second-guess an employer's personnel decision absent demonstrably discriminatory motive."  *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (citation omitted).  Accordingly, Functional Pathways' motion for summary judgment on Count 2 is granted.

### 3.    *Plaintiff's Termination (Count 5)*

The exact contours of plaintiff's disparate treatment claim based on her termination are unclear, as she merely states, in a conclusory manner, that "[d]efendant terminated [p]laintiff because she requested additional leave and could not return to work due to her disability." Compl. ¶ 118.[9]  Functional Pathways does not argue that plaintiff failed to establish a prima facie case of disparate treatment and concedes that plaintiff's termination constitutes an adverse action.  Def.'s Mem. at 10 n.6.  Instead, Functional Pathways offers a legitimate, nondiscriminatory reason for plaintiff's termination: Plaintiff did not provide, by November 10, 2020, the medical information requested in order to be considered for an additional term of leave, despite multiple reminder emails from West, which plaintiff acknowledged she received and chose not to reply to, and a warning that if plaintiff continued to fail to provide this information, "any absences beginning on November 6, 2020 will be considered unexcused failure to provide this information and will subject [her] to discipline, up to and including termination."  West Decl., Ex. 11; *see also* Def.'s Mem. at 10–12.  When plaintiff repeatedly failed to "submit the information requested" and "failed to make any contact at all with anyone,"

---

[9]      Plaintiff's disparate treatment claim based on her termination is plainly untimely because this action was filed over two years after her termination, and plaintiff's Intake Questionnaire, which was filed three months prior to her termination and was not subsequently supplemented and thus made no mention of plaintiff's termination, did not toll the one-year limitations period. *See* D.C. Code § 2-1403.16(a).  Functional Pathways, however, does not argue that plaintiff's disparate treatment claim based on her termination is time-barred, and plaintiff's claim is thus not dismissed on this basis.

Functional Pathways notified plaintiff, on December 1, 2020, that it "consider[ed] [her] to have voluntarily resigned [her] position effective November 10, 2020." Pl.'s 1st Dep., Ex. 32; *see also supra* Part I.A.4; *see, e.g.*, *Johnson v. District of Columbia*, 207 F. Supp. 3d 3, 12 (D.D.C. 2016) ("[Plaintiff's] November 23 deadline [for submitting ADA paperwork] came and went. She did not submit all of the necessary paperwork.  Nor did she report to work.  So the District did exactly as it said it might do, and separated [plaintiff] from employment.  An employee's failure to report to work or submit necessary paperwork can be a legitimate basis for termination."); *Diggs v. Potter*, 700 F. Supp. 2d 20, 49 (D.D.C. 2010) (finding, based on "[t]he record evidence" demonstrating that "the Postal Service repeatedly, consistently and clearly told plaintiff to provide updated medical documentation and warned him that failure to do so could result in discipline up to and including termination," that "the Postal Service has carried its burden in demonstrating that it terminated plaintiff for [the] legitimate, non-discriminatory reason[]" of "failing to provide updated medical information").  Plaintiff, in turn, has produced no evidence, much less sufficient evidence, to suggest that Functional Pathways' proffered reason was not the actual reason and that the employer's actions were discriminatory. Accordingly, Functional Pathways' motion for summary judgment on Count 5 is granted.

To be clear, the dismissals of each of plaintiff's disparate impact claims, which are based on the conclusion that Functional Pathways has met its burden to produce a legitimate, nondiscriminatory reason for each of the alleged adverse actions, do not turn on any credibility determinations, which is outside the Court's prerogative.  Rather, these decisions turn on an employer's low burden at this stage of the *McDonnell-Douglas* framework, which is one of production, not persuasion.  The burden remains on plaintiff to prove that a reasonable jury could conclude from all the evidence that the allegedly hostile work environment was retaliatory—a

burden plaintiff has made little to no attempt to satisfy, and thus has failed to do for each of her three disparate impact claims.

### B.    Failure to Accommodate

To establish a prima facie case of disability discrimination for failure to accommodate under the DCHRA, a plaintiff must show that (1) she had a disability, (2) her employer knew about her disability, (3) she can perform the essential functions of her position with or without a reasonable accommodation, and (4) a reasonable accommodation could have been made, but was denied, by defendant for plaintiff's disability. *See Turner v. D.C. Off. of Human Rights*, 243 A.3d 871, 875–76 (D.C. 2021); *Grant*, 786 A.2d at 583.

"Few disabilities are amenable to one-size-fits-all accommodations." *Ward v. McDonald*, 762 F.3d 24, 31 (D.C. Cir. 2014).  "To meet its obligations," therefore, "an employer needs information about the nature of the individual's disability and the desired accommodation—information typically possessed only by the individual or her physician." *Id.* Especially where "the need for an accommodation is not obvious, an employer, before providing a reasonable accommodation, may require that the individual with a disability provide documentation of the need for accommodation," so that "together," the employer and employee "can determine what accommodation would enable the employee to continue working." *Id.* at 31–32 (citation omitted).  "Neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability." *Id.* at 32 (alteration in original accepted and citation omitted).

### 1.    *Plaintiff's Request for a Special Computer (Count 3)*

Under the DCHRA, an employee must file a complaint "in a court of competent jurisdiction within one year of the unlawful discriminatory act, or the discovery thereof," but this

one-year limitations period is "toll[ed]" upon "timely filing of a complaint with [DCOHR]" "while the complaint is pending."  D.C. Code § 2-1403.16(a).  The Court assumes, without deciding, that plaintiff's Intake Questionnaire, which was filed within a year of the alleged discriminatory act and, though barebones and conclusory, arguably alleges that plaintiff requested a continuation of her "existing accommodation," tolled the one-year statute of limitations and thus that her complaint is timely.  Pl.'s 2d Dep., Ex 38; *see also* Def.'s Mem. at 18–20 (arguing that Count 3 is time-barred).

On the merits, the precise contours of plaintiff's failure to accommodate claim are murky, but regardless of how it is read, it fails.  To the extent plaintiff argues that Functional Pathways failed to accommodate her disability by "not respond[ing] to [her] request for accommodation for over half a year," *see* Compl. ¶ 61 (capitalization in original omitted), her allegation is not supported by the record, even when all the evidence is viewed in her favor.  Plaintiff allegedly told Stouffer on September 24, 2019, that she required, as an accommodation, a computer with an enlarged font.  *Id.* ¶¶ 29–30.  She concedes, however, that she never "fill[ed] out any paperwork related to an accommodation request" or had "a follow-up conversation with Ms. Stouffer about [her] need for accommodation."  Pl.'s 1st Dep. at 6.  In October 2019, plaintiff told Aggarwal that she needed an accommodation, and on May 11, 2020, Aggarwal informed her that a special computer was available for her once she provided a reasonable accommodations form signed by her doctor.  *See* Compl. ¶¶ 65, 67; Pl.'s 1st Dep. at 6–9.  Plaintiff's excuse that she was unable to obtain a doctor's note due to the pandemic is accepted as true, though she concedes that she attempted to call her doctor only once and never tried to email or text her doctor.  Pl.'s 1st Dep. at 8.  In addition, plaintiff did not raise her inability to obtain a doctor's note with HR until June 22, 2020, when she asked for an exception from obtaining a doctor's

note, which exception she was granted almost immediately, the day after. Plaintiff then received a special computer on June 30, 2020. While there might have been some delays here or there, none of these delays were particularly lengthy, and "defendant at no point ended the interactive process and, indeed, worked with the plaintiff until she received her requested equipment." *Pauling v. District of Columbia*, 286 F. Supp. 3d 179, 212 (D.D.C. 2017); *see also Mogenhan v. Napolitano*, 613 F.3d 1162, 1168 (D.C. Cir. 2010) (acknowledging that "a long-delayed accommodation could be considered reasonable" but concluding that plaintiff "cannot even begin to establish that the interactive process took too long," where defendant took "an important intermediate step" (citation omitted)).

To the extent plaintiff argues that Functional Pathways failed to accommodate her disability by providing her with an inadequate special computer, which "lacked contrast, which made it visually taxing, and the font size was not large enough to meet [her] needs," Compl. ¶ 73, plaintiff does not allege that Functional Pathways would not have and did not resolve the issue and accommodate her needs. She alleges only that she told Aggarwal, but not HR, that "the computer didn't provide the type of accommodations that [she] felt like [she] needed," Pl.'s 1st Dep. at 8, and provides no information about whether Aggarwal or HR responded or whether any further conversation was had. She does not allege that Functional Pathways refused to engage or that her follow-up request was denied. Under these circumstances, no reasonable jury could conclude that Functional Pathways failed to make reasonable accommodations to her disability.

Accordingly, Functional Pathways' motion for summary judgment on Count 3 is granted.

### 2.     *Plaintiff's Request for an Extended Leave of Absence (Count 4)*

Functional Pathways challenges plaintiff's failure to accommodate claim based on her

requests for an extended leave of absence on a plethora of independent grounds, which

arguments will all be addressed for completeness.[10]  First, Functional Pathways argues that "[a]n

indefinite leave of absence 'is not a request for a reasonable accommodation.'"  Def.'s Mem. at

15 n.12 (quoting *Menoken v. Burrows*, 656 F. Supp. 3d 98, 105 (D.D.C. 2023)).  Functional

Pathways is correct.  *See Sampson v. Citibank, F.S.B.*, 53 F. Supp. 2d 13, 18 (D.D.C. 1999)

(collecting cases concluding that "an indefinite leave period" is "something an employer is not

required to grant" as a reasonable accommodation under the ADA), *aff'd without opinion*, 221

F.3d 196 (D.C. Cir. 2000); *Bramwell v. Blakey*, No. 4-cv-927, 2006 WL 1442655, at *7 (D.D.C.

May 24, 2006) (similar under the Rehabilitation Act); *see also Carr v. Reno*, 23 F.3d 525, 530

(D.C. Cir. 1994) ("[A]n essential function of any . . . job is an ability to appear for work.").

Plaintiff requested and was granted three periods of leave, stretching from August 3 to

November 5, 2020.  When she requested a fourth period of leave, starting November 6, 2020,

West asked plaintiff for "a more specific Medical Certification," which certification must

include, *inter alia*, "the expected duration of any such requested leave and anticipated return

date."  West Decl., Ex. 10.  To be sure, plaintiff submitted a doctor's letter requesting leave from

November 5, 2020 to December 5, 2020, but nothing in the letter, or plaintiff's previous requests

for leave, suggested that plaintiff would or could actually return to work on December 5, 2020.

Indeed, plaintiff concedes that she did not provide the specific information West requested,

---

[10]     Plaintiff's failure to accommodate claim based on her request for an extended leave of absence in
November 2020 is plainly untimely because this action was filed over two years after the alleged discriminatory
event, and plaintiff's Intake Questionnaire, which was filed three months prior to the denial of her leave of absence
and was not subsequently supplemented and thus made no mention of the denial of her leave of absence in
November 2020, did not toll the one-year limitations period.  *See* D.C. Code § 2-1403.16(a).  Functional Pathways,
however, does not argue that plaintiff's failure to accommodate claim based on her request for an extended leave of
absence is time-barred, and plaintiff's claim is thus not dismissed on this basis.

including the expected duration of her requested leave and anticipated return date.  Plaintiff's failure to accommodate claim based on the denial of her requests for an unspecified period of extended leave of absence can thus be denied on this basis alone.

Second, Functional Pathways argues that heightened risk of contracting COVID-19 is not necessarily a disability.  *See* Def.'s Mem. at 14.  Again, this is correct.  The DCHRA defines a "disability" as "a physical or mental impairment that substantially limits one or more of the major life activities of an individual having a record of such an impairment or being regarded as having such an impairment."  *Grant*, 786 A.2d at 583 (quoting D.C. Code § 2-1401.02(5A)).  Plaintiff has the burden of establishing that she has a qualifying disability, *see Ward*, 762 F.3d at 31, and whether an individual has a disability is determined on a case-by-case basis, *Grant*, 786 A.2d at 584 & n.1.  The only fact plaintiff alleges regarding her heightened risk of contracting COVID-19 is as follows: "Due to her medical conditions, including breast cancer, hypertension, and adjustment disorder anxiety, [she] was at higher risk of developing serious COVID symptoms than the general population."  Compl. ¶ 75.  This conclusory allegation, without more, is insufficient to establish that plaintiff has a qualifying disability under the DCHRA.  *See, e.g.*, *Gallo v. Wash. Nat'ls Baseball Club, LLC*, No. 22-cv-1092, 2023 WL 2455678, at *7 (D.D.C. Mar. 10, 2023) ("[P]ossible future exposure to COVID-19 based on age does not constitute an impairment under the ADA." (alteration in original accepted and citation omitted)).

Third, Functional Pathways contends that even if plaintiff had a disability, and an indefinite leave of absence were a reasonable accommodation, plaintiff "failed to provide Functional Pathways with the information it needed to evaluate her request for additional medical leave."  Def.'s Mem. at 13.  Again, this is correct.  Here, the interactive process broke

down before Functional Pathways decided on plaintiff's request and no reasonable juror could have found that Functional Pathways, rather than plaintiff, was responsible for the breakdown.

Plaintiff requested three terms of leave of absence, from August 3 to November 5, 2020, and each request was granted by Functional Pathways despite the sparse information in her doctor's notes.  When plaintiff sought a fourth term of leave, Functional Pathways reasonably requested additional information, making clear that it "would be happy to consider another Leave extension" for plaintiff but "would need a more specific Medical Certification in order to consider any additional time off beyond the 11/6/20/date."  West Decl., Ex. 10.  Plaintiff does not dispute that she did not provide any of the requested information, boldly admitting that it was "[s]olely [her] decision" not to provide the requested information.  Pl.'s 1st Dep. at 30.

Over two weeks later, West followed up again, reiterating that she needed a more specific medical certification in order to grant plaintiff an additional term of leave.  When plaintiff stated that she had already provided a doctor's note, West clearly explained the deficiencies in the doctor's note.  *See* West Decl., Ex. 10.  The note did not include the specific nature of plaintiff's impairment, the reason plaintiff needs additional leave, or the expected duration of plaintiff's leave and anticipated return date, as Functional Pathways had repeatedly requested.  *See supra* Part I.A.4.  When reminded by Functional Pathways that a more specific medical certification was needed, plaintiff said: "I do not wish to provide any additional information regarding my personal medical condition."  West Decl., Ex. 11.

Committed to addressing plaintiff's request for leave, Functional Pathways, again, followed up with plaintiff three days later, reiterating that it "will consider another leave extension" as long as plaintiff provides "a more specific doctor's certification," which information "is critical to determining whether [she] qualif[ies] for leave based on [her]

impairment, what limitations or restrictions [she has], and what reasonable accommodation may be appropriate." *Id.* Plaintiff was given until November 20, 2020, to respond and was warned that "[o]therwise, any absences beginning on November 6, 2020 will be considered unexcused and will subject [her] to discipline, up to and including termination." *Id.* Plaintiff neither responded to this email nor provided the requested medical information, despite acknowledging, in her deposition, that she received and read the email. Pl.'s 1st Dep. at 21, 33.

In sum, "[n]o reasonable jury could find that [plaintiff's] accommodation request was denied in light of [Functional Pathways'] continuing good-faith dialogue with [plaintiff] to determine an appropriate accommodation, which dialogue was cut short by" plaintiff's refusal to provide the requested medical paperwork. *Ward*, 762 F.3d at 31. Put differently, no reasonable jury could have found that Functional Pathways denied plaintiff's request for an accommodation. *See Stewart v. St. Elizabeths Hosp.*, 589 F.3d 1305, 1308–09 (D.C. Cir. 2010) (concluding that "[n]othing in the evidence presented suggests that [defendant] acted in anything but an entirely appropriate manner in dealing with [plaintiff's] situation," where plaintiff's supervisor met with plaintiff promptly after she sought an accommodation and told her that he would help accommodate her concerns as soon as she completed disability paperwork, but plaintiff left work that afternoon, never returned, and never submitted the requested medical documentation).[11]

Accordingly, Functional Pathways' motion for summary judgment on Count 4 is granted.

---

[11]     Functional Pathways also argues that plaintiff's claim, premised on D.C. Code § 32-502.01, fails because plaintiff's doctor's notes did not mention COVID. *See* Def.'s Mem. at 15–16. Plaintiff, however, does not bring a cause of action under D.C. Code § 32-502.01, which statute contemplated "a civil penalty of $1,000 for each offense." D.C. Code § 32-502.01(g). Even if plaintiff had brought a claim under D.C. Code § 32-502.01, which provides, in relevant part, that "an employee shall be entitled to leave if the employee is unable to work due to . . . [a] recommendation from a health care provider that the employee isolate or quarantine, including because the employee . . . is at high risk for serious illness from COVID-19," would fail because, as explained above, she failed to provide "[a] recommendation from a health care provider that [she] isolate or quarantine" due to her "high risk for serious illness from COVID-19." *Id.* § 32-502.01(a)(1).

**IV.     CONCLUSION**

For the foregoing reasons, even with all the facts and assumed inferences drawn in her favor, plaintiff fails to satisfy her burden, at the third step of the *McDonnell-Douglas* framework, of persuading that the legitimate, nondiscriminatory reasons proffered by Functional Pathways for plaintiff's PRN status, failure to obtain full-time status, and termination, which reasons are "presumptively valid," *McDonnell Douglas*, 411 U.S. at 805, are pretext for disability discrimination.  Each of plaintiff's disparate treatment claims thus fail.

Plaintiff's failure to accommodate claims also fail.  With respect to her claim based on Functional Pathways' alleged refusal to accommodate her visual disability, Functional Pathways promptly provided plaintiff with a special computer once plaintiff sought an exception from the doctor's note requirement and thus cannot be said to have denied plaintiff's request for a reasonable accommodation.  With respect to her claim based on the denial of her request for a fourth indefinite leave of absence, plaintiff has failed to establish that she sought a reasonable accommodation, that she has a qualifying disability, or that she was denied her request for a reasonable accommodation, when plaintiff, despite Functional Pathways' numerous requests, knowingly and intentionally refused to provide the requisite medical documents.

Accordingly, Functional Pathways' Motion for Summary Judgment, ECF No. 18, is **GRANTED**.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:   April 26, 2024

_____
**BERYL A. HOWELL**
United States District Judge

32